**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

---

Monique L. Moorer,
    Plaintiff,
v.                                                  Case No. _____

Always Towing and Recovery, Inc.,
All City Recovery, Inc., and
Global Lending Services, LLC,

    Defendants.

---

## Complaint

---

Plaintiff Monique Moorer, by her attorney, DeVonna Joy, alleges as follows:

### I. Introduction

This is a case brought by a consumer against towing companies and a financial institution for violating consumer protection statutes pertaining to an illegal repossession. Specifically, the towing companies, acting in concert, violated the Fair Debt Collection Practices Act when they acted as a debt collector in illegally repossessing plaintiff's car. The finance company and towing companies also violated various provisions of the Wisconsin Consumer Act relating to this illegal self-help repossession. Plaintiff seeks statutory damages and statutory relief, declaratory relief, actual damages, punitive damages, and reasonable attorney's fees and costs of the action.

## II. Jurisdiction and Venue

1. Jurisdiction of this Court arises under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

2. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in that the plaintiff lives in Milwaukee County, two of the defendants transact business here, and the conduct occurred here.

## III. The Parties

4. Plaintiff Monique L. Moorer is a natural person and citizen of Wisconsin residing in Milwaukee County at 2221 North Teutonia Avenue, Milwaukee, WI 53205.

5. Plaintiff is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a(3) and a "customer" as defined by § 421.301(17), Wis. Stats.

6. Defendant Always Towing and Recovery, Inc. ("Always Towing") is a Wisconsin corporation, with a principal office located in Milwaukee County at 3700 W. Wells St., Milwaukee, WI 53208. Always Towing is a "debt collector" as defined by § 427.103(3) and a "debt collector" as defined by 15 U.S.C. § 1692a(6).

7. Defendant All City Recovery, Inc. ("All City") is a Wisconsin corporation, with a principal office located in Milwaukee County at 3700 W. Wells St., Milwaukee, WI 53208. Always Towing is a "debt collector" as defined by § 427.103(3) and a "debt collector" as defined by 15 U.S.C. § 1692a(6). Always Towing and All City acted in

concert in dealing with the plaintiff and her vehicle.

8. Defendant Global Lending Services, LLC ("GLS") is a foreign limited liability company, with a primary place of business in Atlanta, GA and with an office located in Greenville, SC. GLS is a "debt collector" as defined by § 427.103(3), Wis. Stats., and a "merchant" as defined by § 421.301(25), Wis. Stats., and a "creditor" as defined by § 421.301(16), Wis. Stats.

### IV. Facts

9. On June 7, 2014, Monique Moorer bought a 2012 Ford Fusion car from Van Horn Motors of Milwaukee for a total price of $23,074.88. Ms. Moorer paid $2,000.00 down on the car and financed the balance via a Retail Installment Sales Contract (RISC).

10. GLS was the assignee of the RISC and provided financing for the purchase of the car. The 2014 financing included the following terms:

   a. Amount financed: $14,661.40

   b. Finance charge: $6,413.48

   c. Amount of monthly payments: $439.06, monthly, beginning 7/22/14

   d. Number of monthly payments: 48

   e. Annual percentage fee: 18.65%

11. The financing on the car is a "consumer credit transaction" as defined by § 421.301(10), Wis. Stats. The financing is also a "consumer transaction" as defined by

3

§ 421.301(13), Wis. Stats.

12. The financing on the car by GLS to Ms. Moorer is a "claim" as defined by § 427.103, Wis. Stats.

13. Ms. Moorer made timely payments from July 2014 through April 2015, often paying her obligation early.

14. At the end of December, 2014, Ms. Moorer lost her job. She continued to make her payments timely for as long as possible. In May, 2015, Ms. Moorer got behind on her monthly payments, because she was no longer working.

15. Ms. Moorer made periodic payments for some months after that, as much as she could each time, when she could. She informed GLS of the loss of employment and her attempts to pay what she could pay at the time.

16. The first payment that Ms. Moorer missed was due on May 22, 2015 in the amount of $439.06.

17. On June 26, 2015, GLS sent Ms. Moorer a Notice of Right to Cure" and "Notice of Repossession of Motor Vehicle." The notices alleged that Ms. Moorer was in default for non-payment of amounts due and gave the last day for payment as July 12, 2015.

18. The Notice of Right to Cure Default did not meet the requirements of §§ 425.104 and 425.105, Wis. Stats., because Ms. Moorer was not in default on June 26, 2015 and because it did not itemize the "delinquency charge."

19. On June 26, 2015, Ms. Moorer was not in default. The term "default" is specifically defined in § 425.104, Wis. Stats. Under the pertinent language of § 425.103(2)(a), Wis. Stats., "default" means:

> With respect to a transaction other than one pursuant to an open-end plan...if the interval between scheduled payments is 2 months or less, to have outstanding an amount exceeding one full payment which has remained unpaid for more than 10 days after the scheduled or deferred due dates....

20. The earliest time that Ms. Moorer was legally in "default" under Wisconsin law for missing the May 22, 2015 payment would have been July 2, 2015. That is the first day that an amount exceeding one full payment had remained unpaid for more than ten days.

21. The June 26, 2015 Notice of Right to Cure and Notice of Repossession were defective under Wisconsin law. Because GLS had not sent a proper Notice of Right to Cure on June 26, 2015 and, in the same letter, threatened Ms. Moorer with repossession of her car, it was threatening to take action that could not legally be taken at that time.

22. Ms. Moorer made two more payments to GLS, one on or about June 27, 2015 in the amount of $160.00, and another on or about June 30, 2015 in the amount of $150.00.

5

23. In or about early August, 2015, plaintiff spoke with GLS to advise that she would be starting new employment beginning September 27 and until she could rely on that regular pay to get caught up, she would continue to make payments as she could. She promised to make a payment of $150.00 as soon as possible and another payment of $175.00 shortly thereafter.

24. It was Ms. Moorer's understanding in that phone call with Brian that GLS was in agreement with her plan to make the payments of $150.00 and $175.00 in August.

25. On or about August 4, 2015, Ms. Moorer made a payment to GLS in the amount of $150.00, as she agreed with GLS that she would do.

26. On or about August 19, 2015, Ms. Moorer made another payment to GLS in the amount of $175.00, as she agreed with GLS that she would do.

27. On August 6 2015, (in between receiving those August payments and despite her communication and agreement with GLS), GLS claims it sent Ms. Moorer a Notice of Right to Cure and a Notice of Repossession. Ms. Moorer did not receive that notice.

28. Without regard to whether Ms. Moorer received the August 6, 2015 Notice of Right to Cure and Notice of Repossession, the August 6, 2015 Notice of Right to Cure was defective under Wisconsin law. This notice did not properly itemize the amounts due, specifically the delinquency charges, as is required under § 425.104, Wis. Stats.

29. The August 6, 2015 Notice of Right to Cure Default did not meet the requirements of §§ 425.104 and 425.105, Wis. Stats., and GLS had no present right to repossess Ms. Moorer's car at any time.

30. Ms. Moorer made another payment to GLS on or about September 14, 2015, paying $250.00 to try to get caught up on her car payments.

31. On or about October 5, 2015, plaintiff called GLS to get information to make another payment. She was given the wrong information in that telephone call about how much was actually owing on the account.

32. In the October 5, 2015 telephone call, GLS asked Ms. Moorer to pay $432.18, which GLS stated would make Ms. Moorer only two payments behind. Ms. Moorer explained that she did not have that amount of money in her account and would have to move some money to make a payment and would make that payment online.

33. Later that day, on October 5, 2015, Ms. Moorer made a $300.00 payment to GLS.

34. On or about October 13, a GLS representative called Ms. Moorer's son on his telephone and told him that they needed a call from Ms. Moorer and they were looking for her car. This phone call was conduct that could reasonably expected to harass or threaten Ms. Moorer.

35. On or about October 13, a GLS representative called Ms. Moorer's sister at her telephone number and spoke with her about Ms. Moorer's car, which GLS was

7

looking for. This phone call was conduct that could reasonably expected to harass or threaten Ms. Moorer.

36. On November 10, 2015, at approximately 10:40 a.m., Ms. Moorer called GLS to try to make a payment by electronic bank transfer or on-line. She was told that she could no longer make a payment on-line or by credit card or debit card or by bank transfer. The representative said that because her car was up for repossession, GLS needed "certified funds." Ms. Moorer was further told she could only make a payment by Western Union or Moneygram, both of which are payment methods that would cost Ms. Moorer money simply in order to make a payment.

37. GLS's representations that the only way plaintiff could make a payment was via a means that would cost her additional money to make a payment, were false and made to harass Ms. Moorer and make her jump through extra hoops she was not legally required to do. These additional amounts constituted illegal charges.

38. The GLS representative asked how soon Ms. Moorer could make another payment after the payment plaintiff was going to make that day. Ms. Moorer said that she would pay another $500.00 on Friday (November 13, 2015), and GLS agreed to that plan.

39. After she hung up from the call with GLS on November 10, 2015, Ms. Moorer got in her car and drove directly to Western Union and made a payment to GLS in the amount of $525.00.

40. On that same day, November 10, 2015, Ms. Moorer made the Western Union payment to GLS at 11:32 a.m.

41. After making the payment, Ms. Moorer then returned to work and telephoned GLS to advise it of the payment and Western Union confirmation number.

42. On November 10, 2015, Ms. Moorer expressed concern about the impending repossession and asked what would happen. Ms. Moorer was assured by GLS that GLS had put the repossession "on hold" and that Ms. Moorer did not "need to worry about them picking it up."

43. After Ms. Moorer had made the Western Union payment and before she finished her shift at work, defendant Always Towing and/or All City repossessed and towed Ms. Moorer's car from the parking lot of her place of employment.

44. Ms. Moorer's car was taken to the principal business address of defendants All City and Always Towing, at 3700 W. Wells, Milwaukee, WI.

45. At no time did Ms. Moorer consent to having her car repossessed or voluntarily surrender her car to defendants.

46. Defendants did not have a legal right to repossess or tow Ms. Moorer's car at the time they did so.

47. At the end of her work day, Ms. Moorer discovered that her car was missing from the parking lot of her employment.

48. Because she had made the payment to GLS and was told by GLS that the

repossession had been canceled, Ms. Moorer panicked, initially thinking that her car had been stolen.

49. Ms. Moorer was emotionally distressed and extremely upset and crying when she discovered her car missing. She was also humiliated when she learned that GLS had towed the car from her employment parking lot, especially because she had recently started this new job. It was embarrassing for her to explain people at work why her car was towed. Thereafter, Ms. Moorer continued to be anxious about having her car towed again after that, because GLS had already taken it without a legal right in the past.

50. When Ms. Moorer got home from work on November 10, 2015, she immediately called GLS. She was told that she would need to pay July and August payments in order to get the car back and that she would have to talk to "Tara" at GLS the next day.

51. On November 11, 2015, Ms. Moorer called GLS and spoke to Tara, who told Ms. Moorer that her car had been repossessed at 11:43 a.m. Ms. Moorer explained that this was impossible, because she had used her car to drive to Western Union to make a payment to GLS at that time. Tara was rude to Ms. Moorer and told plaintiff that the repossession was legal and that the car was ready for auction. Tara further told Ms. Moorer that she would have to speak with Jason at GLS about any matters regarding the "legal" repossession.

52. Ms. Moorer tried calling Jason several times on November 11, 2015 and

10

November 12, 2015, but she was told each time that he was not available and that Jason goes from one meeting straight to another.

53. On November 11, 2015, Tara from GLS told Ms. Moorer that she would have to pay an additional $1,010.00 via Western Union in order to get her car back.

54. Although Ms. Moorer did not have this amount of money, she borrowed the $1,010.00 in order to redeem her car.

55. On the morning of November 11, 2015 at 11:44 a.m., Ms. Moorer went to Western Union and made a payment to GLS in the amount of $1,010.00.

56. On November 11, 2015, Ms. Moorer called GLS to provide the information of the (second) Western Union payment (in the amount of $1,010.00). She attempted to get information about where her car was located, so that she could get it back.

57. Tara from GLS told Ms. Moorer that despite the payment of $1,010.00, Ms. Moore could not get her car back, because it was ready for auction. Tara told Ms. Moorer that her option was to have the money refunded to her, because her car was going to be auctioned.

58. Ms. Moorer asked Tara why she was not being given an opportunity to remedy the situation. Tara said that it was because she had calculated wrong and had given Ms. Moorer the wrong figure to pay.

59. Tara further stated on November 11, 2015 that Ms. Moorer would have to pay an additional $165.00 in order to get the car back. Ms. Moorer said that she was

11

willing to pay the additional $165.00.

60. On the morning of November 12, 2015, Ms. Moorer paid GLS via Western Union a third payment in as many days, in order to get her car back.

61. Ms. Moorer called GLS to give the confirmation number, and Tara told her that the car had been repossessed by All City and gave her the address 3700 W. Wells in Milwaukee.

62. At no time did GLS send Ms. Moorer a Notice of Right to Redeem her car or anything telling her about the right and/or process to redeem or provide her a statement of any costs and fees associated with the repossession.

63. On November 12, 2015, Ms. Moorer went to 3700 W. Wells, where the signs identified the place as Always Towing.

64. Ms. Moorer's car was located in the far back of the lot, requiring several cars to be moved to retrieve it.

65. The person at All City and/or Always towing demanded that Ms. Moorer pay an additional amount of $135.00 in order for her to get her car back. Ms. Moorer paid the $135.00 and was given a document identifying itself as All City and stamping the document "paid" with the (wrong) date of November 11, 2015.

66. On or about November 12, 2015, GLS sent Ms. Moorer a "Notice of Our Plan to Sell Property" and stated that Ms. Moorer's car would be sold on "11-30-15 or after."

12

67. This notice, as with all notices sent by GLS, failed to comply with the Wisconsin Consumer Act and were part of a series of conduct that harassed Ms. Moorer.

68. This notice, as with all notices sent by GLS, threatened conduct that could not legally be taken against Ms. Moorer, given GLS's failure to comply with the Wisconsin Consumer Act.

69. GLS's failure to provide Ms. Moorer a proper right to redeem was a violation of the Wisconsin Consumer Act.

70. GLS's conduct in blocking Ms. Moorer's right to make payments in various ways and only permitting her to make payments in ways that cost her additional money was a violation of law and constituted illegal delinquency charges.

71. On December 1, 2015, GLS sent Ms. Moorer a "Notice of Right to Cure" and "Notice of Repossession," telling plaintiff that she was in default and threatening to repossess her car if the amount supposedly due was not paid by 12/19/15.

72. At the time GLS sent the notice, Ms. Moorer was not in default.

73. The Notice of Right to Cure Default did not meet the requirements of §§ 425.104 and 425.105, Wis. Stats., because Ms. Moorer was not in default on December 1, 2015 and because it did not itemize the "delinquency charge." The Notice of Right to Cure Default was also defective misstated the amount actually due to GLS.

74. The Notice of Repossession threatened action that could not legally be taken.

75. Ms. Moorer suffered actual damages, including emotional distress and mental anguish, lost wages, humiliation, loss of privacy, loss of use of her vehicle, and monetary loss as a result of defendants' illegal conduct.

76. Defendants acted with malice and/or with an intentional disregard of the rights of plaintiff in its dealings with plaintiff.

## V. Claims

### First Claim
### Violation of the Fair Debt Collection Practices Act
### Against All City and/or Always Towing

77. Plaintiff incorporates by reference all preceding paragraphs.

78. GLS's loan to Ms. Moorer is a "debt" as defined in 15 U.S.C. § 1692(a)(5).

79. All City and/or Always Towing violated 15 U.S.C. § 1692f(6).

80. Plaintiff is entitled to recover her damages, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

### Second Claim
### Illegal Repossession by GLS

81. Plaintiff incorporates by reference all preceding paragraphs.

82. GLS violated §§425.205(1)(g), 425.206, 425.104 and 425.105, Wis. Stats.

83. Plaintiff suffered damages as a result of GLS's violations of these laws.

84. Plaintiff is entitled to all of the remedies identified in §§ 425.305, 425.306, and 425.308, Wis. Stats.

14

## Third Claim
## Violation of Wis. Chapter 427 -Illegal Debt Collection
## Against All Defendants

85.     Plaintiff incorporates by reference all preceding paragraphs.

86.     Section 427.104(1), Wis. Stats., provides in pertinent part that:

In attempting to collect an alleged debt arising from a consumer credit transaction or other consumer transaction, including a transaction primarily for an agricultural purpose, where there is an agreement to defer payment, a debt collector may not:

(h)     Engage in other conduct which can reasonably be expected to threaten, or harass the customer or person related to the customer;

(j)     Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exists....

87.     Defendants violated § 427.104(1), Wis. Stats.

88.     Plaintiff is entitled to all of the remedies identified in §§ 425.105, 425.304, 425.306, and 425.308, Wis. Stats., as well as punitive damages.

## Fourth Claim
## Violation of Wis. Stat. 895.446 - Civil Theft
## Against GLS

89.     Plaintiff incorporates by reference all preceding paragraphs.

90.     GLS intentionally took and carried away Ms. Moorer's vehicle without her consent and without the lawful right to do so and with intent to deprive her permanently of possession of the car, in violation of §§ 943.20 and 895.446, Wis. Stats.

15

91. Plaintiff suffered a loss and actual damages as a result of defendants' conduct, and pursuant to § 895.446, Wis. Stats., is entitled to recover her actual damages, all costs of investigation and litigation that were reasonably incurred, including the value of the time spent by her attorney, and punitive or exemplary damages of not more than three times the actual damages, from GLS.

WHEREFORE, plaintiff requests judgment in her favor and against defendants on the claims set forth in the complaint, that a declaration be entered that defendants violated the above statutes and laws, that GLS is responsible for Always Towing's and All City's violations, that Always Towing and All City were acting in concert, that plaintiff be awarded her reasonable attorney's fees and costs of the action; and for such other relief as the Court deems just.

**Plaintiff demands that this case be heard by a jury.**

Dated this 9th day of November, 2016.

Attorney for Plaintiff

__/s/ DeVonna Joy_____

Consumer Justice Law Center, LLC
P.O. Box 51
Big Bend, WI 53103-0051
Telephone: 262-662-3982
E-mail: consumerjusticelaw@wi.rr.com

DeVonna Joy, SBN 1018939