UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MONIQUE L. MOORER,

        Plaintiff,

    v.                                       Case No. 16-cv-1504-pp

ALWAYS TOWING AND RECOVERY INC.,
ALL CITY RECOVERY, INC., and
GLOBAL LENDING SERVICES LLC,

        Defendants.

---

**ORDER DENYING JOINT MOTION FOR EXTENSION OF TIME
TO FILE ANSWER BY ALL CITY RECOVERY, INC. AND ALWAYS
TOWING AND RECOVERY, INC. (DKT. NO. 56), DENYING MOTION FOR
SUMMARY JUDGMENT BY ALL CITY RECOVERY, INC. AND ALWAYS
TOWING AND RECOVERY, INC. (DKT. NO. 45) AND DENYING MOTION TO
DISMISS BY GLOBAL LENDING SERVICES, LLC (DKT. NO. 25)**

---

The defendants took steps to repossess the plaintiff's car after she failed
to make payments under a contract. Dkt. No. 1. The plaintiff sued the two
towing companies, Always Towing and Recovery Inc. (Always Towing) and All
City Recovery, Inc. (All City), as well as the financer for the car loan, Global
Lending Services LLC (GLS); she alleged violations of the Fair Debt Collection
Practices Act and state law. Id. After the plaintiff filed an amended complaint,
dkt. no. 23, GLS filed a timely motion to dismiss, dkt. no. 24. Always Towing
and All City failed to timely file an answer or other response to the amended
complaint. Instead, they waited four months, then filed a motion for summary
judgment. Dkt. No. 45. Some forty-five days later, Always Towing and All City

filed a motion asking the court to extend the time for them to answer or otherwise respond to the amended complaint. Dkt. No. 56.

Because Always Towing and All City have not shown excusable neglect to support their motion for extension of time, and because they did not support their summary judgment motion with admissible evidence, the court will deny both motions. The court also will deny GLS's Rule 12(b)(6) motion to dismiss, because the plaintiff has sufficiently alleged four claims against GLS.

## I.      Procedural History

When the plaintiff filed the original complaint, the named parties consented to the magistrate judge hearing and deciding the case. Magistrate Judge William Duffin conducted a Rule 16 scheduling conference on January 10, 2017. Dkt. No. 17. He ordered the parties to amend their pleadings no later than February 10, 2017; to file summary judgment motions no later than June 23, 2017; and to conclude discovery by December 18, 2017. Id.

On February 10, 2017, All City and Always Towing filed a third-party complaint against A1 Nationwide (A1), and a cross complaint against GLS. Dkt. No. 21. The plaintiff amended her complaint that same day. Dkt. No. 23. On February 24, 2017, GLS filed a motion to dismiss the amended complaint, dkt. no. 25, and an answer with a counterclaim against Always Towing and All City, dkt. no. 27. Although Always Towing and All City did not answer the plaintiff's amended complaint, they filed an answer to GLS's counterclaim on March 3, 2017. Dkt. No. 27.

Always Towing and All City waited just fourteen days before moving for default against A1, the third-party defendant. Dkt. No. 36. At that point, the clerk's office reassigned the case to Judge Pepper.

On June 23, 2017, All City and Always Towing filed their motion for summary judgment. Dkt. No. 45. The plaintiff responded to the motion on July 22, 2017, raising the issue of the defendants' default. Dkt. No. 48. All City and Always Towing waited six weeks, then—in response to the plaintiff's summary judgment arguments—moved for an extension of time to file their answer. Dkt. No. 56. The plaintiff opposed the motion for extension of time. Dkt. No. 58.

## II. Joint Motion for Extension of Time to File Answer by All City and Always Towing (Dkt. No. 56)

All City and Always Towing cite Federal Rule of Civil Procedure 6(b) in support of their request that the court extend their deadline to answer or otherwise respond. That rule says that a court may extend deadlines "for good cause," "on motion made after the time has expired if a party failed to act because of excusable neglect." Rule 6(b)(1)(B). The moving party has to show that its neglect was excusable. Simstad v. Scheub, 816 F.3d 893, 899 (7th Cir. 2016). A court's decision about excusable neglect is "'at bottom an equitable one, taking into account all relevant circumstances . . . includ[ing] . . . the danger of prejudice . . . the length of the delay . . . the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'" Id. (quoting Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 394 (1993)). In at least one case, the Seventh Circuit has found an attorney error to constitute

excusable neglect where the attorney acted in good faith and the error did not prejudice the opposing party. See Crue v. Aiken, 370 F.3d 668, 680–81 (7th Cir. 2004).

Always Towing and All City assert that counsel, Attorney Michael S. Maistelman, failed to answer the amended complaint because he did not receive notification that the plaintiff had filed it. Dkt. No. 56 at ¶10. The defendants explain that, on February 10, 2017, Attorney Maistelman was trying to electronically file the third-party complaint against A1 and the cross-complaint against GLS. Id. at ¶6. They indicate that Maistelman "encountered difficulties and/or malfunctions with the electronic case filing system," which required him to seek assistance from one of the case administrators in the clerk's office. Id. at ¶8. The defendants assert that the plaintiff filed her amended complaint while Maistelman was involved in this process. Id. at ¶9. Maistelman submitted an affidavit, attesting that while he was working with the clerk's office, he received "many emails from ECF and the Eastern District," but that he did not receive one telling him that the plaintiff had filed the amended complaint. Dkt. No. 56 at ¶6. He stated that he searched both his official firm email box and his back-up email box. Id. at ¶¶5, 9.

The docket indicates that the amended complaint was served electronically at 2:30 p.m. CST on February 10, 2017 on Michael Rud (michaelrud86@gmail.com) and Michael S. Maistelman (msm@maistelmanlaw.com, mmaistelman@gmail.com). Maistelman avers that Attorney Rud left the firm the month before the plaintiff filed the amended

complaint, dkt. no. 57 at ¶4; the defendants stated as much in their motion to substitute counsel, filed on February 23, 2018, dkt. no. 63 at 2.

Based on these facts, the court will accept the defendants' assertion that Maistelman may not have received notice on February 10, 2017 that the plaintiff had amended her complaint. But that does not explain why the defendants did not file an answer within the following twenty-one days. On February 24, 2017—fourteen days after the plaintiff filed the amended complaint, and a week before answers were due—GLS filed a motion to dismiss the amended complaint, dkt. no. 25, along with a supporting brief, dkt. no. 26. The docket shows that this motion was electronically served on Maistelman at both of his email address at 4:55 p.m. on February 24, 2017. Id. This should have given defense counsel a heads-up that the plaintiff had amended the complaint, and the defendants do not address this in their motion or their reply.

It was another five months and two weeks before the defendants filed their motion for an extension of time to answer. During that time, the plaintiff responded to GLS's motion to dismiss the amended complaint, dkt. no. 32; the docket shows electronic service of that document on Maistelman at 10:02 p.m. on March 17, 2017, id. Again, this should have given the defendants a heads-up that there was something they ought to check into. On March 20, 2017, Attorney Elizabeth Shimek filed a notice of appearance for the defendants. Dkt. No. 34. According to her affidavit, however, she had begun reviewing "the file" on March 3, 2017; she indicates that "the file" "did not include a copy of the

Amended Complaint." Dkt. No. 60 at ¶4. She concedes that she "briefly reviewed Global Lending Services, LLC's Motion to Dismiss the Amended Complaint" and noted that she needed to print out a copy, but "trusted that the case was up to date and no new filings were otherwise due, as I had been told by Atty. Maistelman." Id. On the date she filed her appearance, she obtained access to CM/ECF, but "did not check to see whether an Answer was ever filed for the Amended Complaint, as I was under the impression that the case was up to date when I was introduced to it in late February 2017." Id. at ¶5.

Somewhat ironically, on March 24, 2017, the defendants filed a motion to hold the third-party defendant A1 in default because A1 missed the March 6, 2017 deadline for filing an answer. Dkt. No. 36. In the motion, the defendants referred to A1's failure to file an answer—eighteen days after the deadline—as "blatant disregard for the deadlines set by Rule 12(a) . . . ." Dkt. No. 36 at 3. In their supporting brief, the defendants argued that

> A1's failure to promptly tender the defense of its suit to its insurer and appoint counsel moves beyond the simple "inadvertence, mistake, or carelessness" or "intervening circumstances beyond the party's control". Chorosevic v. MetLife Choices, 600 F.3d 934, 946 (8th Cir. 2010) (quoting Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 392 (1993)). Instead, A1 blatantly disregarded the Federal Rules of Civil Procedure, and therefore its answer should be struck and default judgment should be entered in Always' favor.

Dkt. No. 37 at 3.

Finally, in late June 2017, Attorney Shimek began drafting the defendants' summary judgment motion. Dkt. No. 60 at ¶6. She says that she focused on, and printed out, a copy of the amended complaint, but "did not

notice that Always and All City never answered the Amended Complaint, as so many things had happened in the intervening months in the case." Id. The defendants filed the motion for summary judgment on June 23, 2017; on the very first page, they stated that they were seeking summary judgment "in all claims asserted against them by Plaintiff, Monique L. Moorer, *in the Amended Complaint.*" Dkt. No. 45 at 1 (emphasis added). Despite this, Shimek says that it was not until she reviewed the plaintiff's response to the summary judgment brief in July 2017 that she checked the docket and realized that the defendants had failed to answer. Id. at ¶7. This prompted Maistelman's investigation into his email boxes. Id.

The plaintiff filed her opposition to the defendants' motion for summary judgment on July 22, 2017. Dkt. No. 48. Although Shimek says this document finally alerted the defendants to the fact that they had not answered the amended complaint, they did not file their motion for an extension of time to answer until August 7, 2017—over two weeks later. Dkt. No. 56.

So—even with the assumption that Maistelman did not get notice of the amended complaint on the day the plaintiff filed it, there were at least three events that should have alerted the defendants that it had been filed: GLS's motion to dismiss the amended complaint, the plaintiff's response to that motion and the defendants' review of the docket while preparing the summary judgment motion. And while the defendants argue strenuously that their six-month delay was not a big deal, they were quick to pounce on A1's eighteen-*day* delay in filing their own motion for default.

7

The defendants argue that mistakes in pleading should not be used as a game of "gotcha," and they cite Edelman v. Belco Title & Escrow, LLC, where the Seventh Circuit Court of Appeals rejected a plaintiff's argument that failure to answer a fourth amended complaint meant that the defendant admitted all allegations. Edelman, 754 F.3d 389, 393 (7th Cir. 2014). Edelman does not help the defendants.

In Edelman, the defendant had answered a second amended complaint before the magistrate judge granted the defendant's motion to dismiss (while giving the plaintiff leave to file another amended complaint). Edelman, 754 F.3d at 394. In quick succession, the plaintiff filed third and fourth amended complaints. Id. Without responding to the fourth amended complaint, the defendant moved for summary judgment. Id. The defendant moved for an extension of time once the plaintiff pointed out the default, and the magistrate judge granted the extension of time. Id. The magistrate judge, however, granted the defendant's summary judgment motion without waiting for the defendant to file the answer. Id. On appeal, the plaintiff argued that the judge should have found that the defendant had admitted all allegations at the summary judgment stage. Id. The Seventh Circuit noted that the defendant had answered the very same allegations in the second amended complaint—the fourth amended complaint simply added allegations against other defendants who had since dropped out. Id. The court reasoned that under those circumstances, the fourth amended complaint essentially reverted to the one that already had been answered. The court determined that if the purpose of a

responsive pleading was to put the plaintiff on notice of what the defendant admitted or contested, then the previous answers accomplished that purpose. Id. at 395.

Unlike the fourth amended complaint in Edelman, which asserted the same claims as the prior complaints, the amended complaint in this case added a new claim (conversion) against these two defendants. The defendants did not respond to the amended complaint—specifically, to that new claim— until they filed a summary judgment motion six months later, and a motion for summary judgment is not a "responsive pleading." See Edelman, 754 F.3d at 394–95.

The defendants also cite Pepper v. Vill. of Oak Park, 430 F.3d 805 (7th Cir. 2005), for their proposition that the Seventh Circuit has found situations like this one to constitute excusable neglect. Pepper is even less persuasive than Edelman. In Pepper, the district court allowed the plaintiff to file an amended complaint *after* the defendants had filed for summary judgment and the plaintiff had responded. Pepper, 430 F.3d at 812 n.3. The plaintiff appealed the district court's grant of the defendant's motion for summary judgment, then argued in the Seventh Circuit that because the defendant had not answered the amended complaint, her allegations should be deemed admitted. Id. at 812. The plaintiff also argued that if the appeals court decided to remand the case to the district court, she would not oppose the defendant's request to file an answer. Id. The Seventh Circuit concluded that the plaintiff's argument was an attempt to "prolong a losing case beyond its natural life." Id. Nowhere in

this decision did the Seventh Circuit discuss excusable neglect, or even allow the defendant to file an answer. It didn't need to—it affirmed the summary judgment ruling in favor of the defendant. For the defendants in this case to argue that Pepper supports a finding of excusable neglect borders on disingenuous.

The defendants have not shown excusable neglect. Attorney Maistelman knew of the deadline for filing pleadings (because he filed his own third-party complaint on that same day), had several hints that an amended complaint had been filed (such as GLS's motion to dismiss that very amended complaint), and he filed his own motion for default against A1 (calling A1's much shorter, eighteen-day delay "inexcusable"). Attorney Maistelman and co-counsel filed their summary judgment motion with respect to the *amended* complaint, and failed to take immediate action once the plaintiff pointed out the default in opposition to summary judgment. The length of the delay and the reasons cited simply don't add up to excusable neglect, and the court cannot find prejudice where the dispositive motion deadline has already passed. The court will deny the motion for extension of time.

### III. Motion for Summary Judgment by All City and Always Towing (Dkt. No. 45)

Because these two defendants did not answer the amended complaint, the court deems the allegations in that complaint admitted, and must deny the defendants' summary judgment motion. But even if they had filed an answer, the defendants have not properly supported their motion.

In their motion for summary judgment, the defendants did not claim that the plaintiff was not able to produce admissible evidence to support particular facts. Fed. R. Civ. P. 56(c)(1)(B). Rather, the defendants asserted that affirmative evidence negated the plaintiff's claims. They filed exhibits A ("Motor Vehicle Consumer Simple Interest Installment Sale and Security Agreement"), B ("Notice of Right to Cure"), C ("Collateral Recovery Agreement"), D ("A1 Nationwide, LLC Repossession Agent Agreement"), E ("Order to Repossess), and F ("Vehicle Release Form"). Dkt. Nos. 47 through 47-5. But they did not file an affidavit or other declaration to authenticate those documents. Under Rule 56(c)(4), an affidavit or declaration used to support a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the materials stated.

When the plaintiff pointed out this deficiency, the defendants argued that they had  filed the summary judgment motion "to preserve" their rights, because the court's scheduling order set the summary judgment deadline almost six months prior to the close of discovery, and "nearly seven months prior to the default close of summary judgment motions, set at thirty days after the close of discovery (January 17, 2018)." Dkt. No. 52 at 2. The implication is that the court (Judge Duffin), with no input from the parties, set an artificially and unreasonably early summary judgment deadline. In their Rule 26(f) plan, however, the parties did not propose a deadline for filing summary judgment motions. Dkt. No. 15. While they told Judge Duffin that they expected to

complete discovery by September 18, 2018, id. at 2, 4, and that they anticipated filing cross-motions for summary judgment, id. at 4, they did not ask the court to set a dispositive motions deadline. The minutes from the January 10, 2017 Rule 16 conference show that the parties discussed the timing for filing summary judgment motions—counsel for GLS proposed filing dispositive motions "early, before the close of discovery." Dkt. No. 16 at 3. Judge Duffin proposed a June 1, 2017 deadline; counsel for the plaintiff asked for a deadline toward the end of June, and Attorney Maistelman, on behalf of Always Towing and All City, indicated that that "work[ed] for him." Id. That is when Judge Duffin set the June 23, 2016 summary judgment deadline. Id.

Further, although Judge Duffin gave the parties (at the defendants' suggestion and agreement) five and a half months to file summary judgment motions, Always Towing and All City never asked him to extend the summary judgment deadline—not after they filed their third-party complaint against A1, not after A1 asked for an extension of time to answer, not after they filed their motion for default against A1. If, as the defendants imply, they did not have enough time to prepare a properly-supported motion for summary judgment, they could have asked Judge Duffin to extend the deadline. For the defendants to now argue that they could not properly support the motion because the court did not give them enough time to do so is, again, borderline disingenuous.

The court denies the defendants' motion for summary judgment, because it deems the facts in the amended complaint admitted and because the defendants did not properly support the motion.

## IV.     Motion to Dismiss by GLS (Dkt. No. 25)

GLS timely filed a motion to dismiss the amended complaint under Rule 12(b)(6). Dkt. No. 25. The plaintiff alleged the following four state law claims against GLS in the amended complaint: (1) illegal repossession in violation of chapter 425 (Second Claim), illegal debt collection in violation of chapter 427 (Third Claim), civil theft (Fourth Claim) and conversion (Fifth Claim).

### A.     Motion to Dismiss Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. Autry v. Nw. Premium Servs., Inc., 144 F.3d 1037, 1039 (7th Cir. 1998). The complaint must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A court will grant a motion to dismiss only if a complaint lacks enough facts to "state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The court accepts as true the allegations raised by the plaintiff unless the allegations are "supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id., 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

B.    The Amended Complaint

1.    *Jurisdiction*

The court has federal question jurisdiction over the case under 15 U.S.C. §1692k(d) and 28 U.S.C. §1331, because the plaintiff alleged a violation of the Fair Debt Collection Practices Act against Always Towing and All City, and alleged that GLS was responsible for those violations. The plaintiff seeks declaratory relief under 28 U.S.C. §§2201 and 2201. The court may exercise supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

2.    Facts

The plaintiff purchased a 2012 Ford Fusion car from Van Horn Motors of Milwaukee for $23,074.88 on June 7, 2014. Dkt. No. 23 at ¶9. She paid $2,000 down on the car and financed the balance via a Retail Installment Sales Contract (RISC). Id. GLS, the assignee of the RISC, provided financing for the purchase of the car. Id. at ¶10. The financing included the following terms:

> Amount Financed: $14,661.40
> Finance Charge: $6,413.48
> Amount of Monthly Payments: $439.06, monthly beginning July 22, 2014
> Number of Monthly Payments: 48
> Annual Percentage Fee: 18.65%

Id.

The plaintiff made timely payments from July 2014 through April 2015, often paying early. Id. at ¶13. She fell behind on her payments after she lost her job at the end of December 2014. Id. at ¶14. The plaintiff informed GLS that she had lost her job and made periodic payments for some months after that (as much as she could, when she could). Id. at ¶15.

The plaintiff missed her first payment on May 22, 2015 in the amount of $439.06. Id. at ¶16. On June 26, 2015, GLS sent the plaintiff a notice of right to cure and notice of repossession of motor vehicle, alleging that she was in default for non-payment of amounts due and notifying her that the last day for payment was July 12, 2015. Id. at ¶17. According to the plaintiff, the notice of right to cure default did not meet the requirements of §§425.104 and 425.105, because (1) she was not in default at that point and (2) the notice did not itemize the delinquency charge. Id. at ¶18.

The plaintiff made two more payments to GLS: one on June 27, 2015 in the amount of $160, and another on June 30, 2015 in the amount of $150. Id. at ¶22. In early August 2015, the plaintiff told GLS that she would begin new employment on September 27, 2015 and could rely on regular pay to get caught up. Id. at ¶23. She promised to make a payment of $150 as soon as possible and another payment of $175 shortly thereafter. Id. The plaintiff understood from her phone call with "Brian" from GLS that it agreed with her plan to make those payments in August. Id. at ¶24. She made a $150 payment on August 4, 2015 and a $175 payment on August 19, 2015.

GLS claims it sent the plaintiff a notice of right to cure and notice of repossession on August 6, 2015; the plaintiff alleges that she did not receive the notice. Id. at ¶27. Again, the plaintiff alleges that the notice of right to cure and the notice of repossession were defective under Wisconsin law because they did not itemize the delinquency charges under Wis. Stat. §425.104 and

because GLS had no present right to repossess the car at any time. Id. at ¶¶28, 29.

The plaintiff made a $250 payment on or about September 14, 2015. Id. at ¶30. When the plaintiff called GLS around October 5, 2015, it gave her the wrong information about how much was owed on the account. Id. at ¶31. GLS said the plaintiff needed to pay $432.18 and that she was only two payments behind. Id. The plaintiff explained that she did not have that much money in her account, and that she would have to move money to make an online payment. Id. Later that day, she made a $300 payment to GLS. Id. at ¶33.

On or about October 13, 2015, a representative of one of the defendants, acting on behalf of GLS, called the plaintiff's son and told him that they needed a call from the plaintiff and they were looking for her car. Id. at ¶34. That same day, one of the defendants, acting on behalf of GLS, called the plaintiff's sister about the plaintiff's car. Id. at ¶35.

On November 10, 2015, while the plaintiff was trying to make an online payment, GLS told the plaintiff that it would no longer accept payment online, or by credit or debit card, or by bank transfer; because the car was "up for repossession," and GLS said it needed certified funds via Western Union or Moneygram. Id. at ¶36. The plaintiff alleged that either of these methods would cost her more money. Id. In response to the GLS representative's inquiry about how quickly the plaintiff could make the next payment, the plaintiff responded that she would pay another $500 on Friday, November 13, 2015; GLS agreed to that plan. Id. at ¶38. When she hung up the call with GLS, the plaintiff drove

directly to Western Union and made a payment of $525. Id. at ¶39. She made that payment at 11:32 a.m. Id. at ¶40.

The plaintiff returned to work on November 10, 2015, and called GLS to tell it about the payment and to provide the Western Union confirmation number. Id. at ¶41. She told GLS that she was worried about the repossession; GLS assured the plaintiff that it had put the repossession on "hold" and that she did not "need to worry about them picking it up." Id. at ¶42. After the plaintiff made the payment, however, and before she had finished her shift at work, Always Towing and All City repossessed her car from the parking lot of her job. Id. at ¶43. They took the plaintiff's car to All City and Always Towing's principal business address at 3700 W. Wells, Milwaukee, Wisconsin. Id. at ¶44. At the end of the work day, the plaintiff discovered her car was missing. Id. at ¶47. She panicked, thinking that her car had been stolen (because she had made the payment and GLS had told her that the repossession had been canceled). Id. at ¶48. The plaintiff became extremely upset and started crying; she also experienced humiliation because she had just started a new job, and she had to explain to new co-workers why her car had been towed. Id. at ¶49.

When she got home from work on November 10, 2015, the plaintiff immediately called GLS. Id. at ¶50. She was told that she would need to make the July and August payments and would have to talk to "Tara" at GLS the next day. Id. at ¶50. On November 11, 2015, the plaintiff called GLS and spoke to Tara, who told her that the car had been repossessed at 11:43 a.m. Id. at ¶51. The plaintiff explained it was impossible, because she had driven the car

17

to Western Union at that time. Id. The plaintiff alleges that Tara was rude, and told the plaintiff that the repossession was legal and that the car was ready for auction. Id. Tara told the plaintiff to speak with Jason at GLS about the "legal" repossession. Id.

Although the plaintiff tried called Jason several times on November 11 and 12, 2015, she was told that Jason was not available. Id. at ¶52. On November 11, 2015, Tara from GLS told the plaintiff she would need to pay an additional $1,010 via Western Union to get the car back. Id. at ¶53. The plaintiff borrowed the money to redeem the car. Id. at ¶54. On the morning of November 11, 2015, at 11:44 a.m., she made the payment to GLS in the amount of $1,010. Id. at ¶55. Tara then told the plaintiff that despite the payment of $1,010, the plaintiff could not get her car back because it was going to be auctioned; Tara said the plaintiff's option was to get her money refunded. Id. at ¶57. The plaintiff asked why she could not have an opportunity to remedy the situation; Tara responded she had given the plaintiff the wrong payment amount. Id. at ¶58. Tara told the plaintiff she would have to pay an additional $165. Id. at ¶59. The plaintiff said she was willing to make that payment. Id.

The plaintiff made her third payment in three days on November 12, 2005. Id. at ¶60. Tara told the plaintiff the car was at All City at 3700 W. Wells. Id. at ¶61. GLS never sent a notice of right to redeem her car or anything telling the plaintiff about the right and/or process to redeem or provide a statement of fees and costs associated with the repossession. Id. at ¶62. On

November 12, 2015, the plaintiff went to 3700 W. Wells, which had signs that said Always Towing. Id. at ¶63. The car was in the back of the lot, id. at ¶64, and the person at All City or Always Towing demanded an additional $135 for her to get the car back, id. at ¶65. The plaintiff paid the $135 and the representative handed her a document from All City stamped "paid" dated November 11, 2015. Id. at ¶65.

On or about November 12, 2015, GLS sent the plaintiff a notice of plan to sell property and stated the car would be sold on "11-30-15 or after." Id. at ¶66. On December 1, 2015, GLS sent the plaintiff a notice of right to cure and notice of repossession, telling the plaintiff that she was in default and threatening to repossess her car if the amount due was not paid by December 19, 2015. Id. at ¶71. At that time, the plaintiff was not in default. Id. at ¶72. The plaintiff alleges that the notice of right to cure did not meet the statutory requirements because the plaintiff was not in default, and because it did not itemize the delinquency charge. Id. at ¶73. It also misstated the amount due to GLS and threatened action that could not be taken. Id. at ¶¶73, 74.

C.    Grounds for Dismissal

1.    *Whether the notice of right to cure was valid, such that GLS had a right to repossess the plaintiff's car*

GLS asserts that all four of the plaintiff's claims against it—illegal repossession, illegal debt collection, civil theft and conversion—turn to some degree on the plaintiff's argument that the notice of right to cure was invalid, and thus that GLS had no legal right to repossess the plaintiff's car. GLS asserts that because the notice of right to cure complied with the requirements

19

of the Wisconsin Consumer Act (WCA), the court must dismiss all four claims. Dkt. No. 25 at 2.

In Wisconsin, no merchant may take possession of collateral unless the merchant believes the plaintiff is in default (Wis. Stat. §425.103), provides notice of the right to cure (Wis. Stat. §425.104), and waits to repossess until the expiration of fifteen days after it has given notice of the right to cure (Wis. Stat. §425.105(1)). The purpose of the notice of right to cure "is to give the customer an opportunity, before the merchant accelerates the obligation, to restore his or her loan to a current status and thus preserve the customer-merchant relationship." <u>Rosendale State Bank v. Schultz</u>, 123 Wis. 2d 195, 199 (Ct. App. 1985).

The plaintiff first argues that she was not in default on the loan, as default is defined by Wisconsin law. The WCA defines default under Wis. Stat. §425.103(2)(a) as follows:

> (2) "Default," with respect to a consumer credit transaction, means without justification under any law:
>
> (a)    With respect to a transaction other than one pursuant to an open-end plan; if the interval between scheduled payments is two months or less, to have outstanding the amount exceeding one full payment which has remained unpaid for more than 10 days after the scheduled or deferred due date
> ....

Wis. Stat. §425.103(2)(a).

The exhibits to the motion to dismiss show that the plaintiff's scheduled payments were due on the 22nd of each month. Dkt. No. 26-1 at 1. The plaintiff paid every month from July 2014 through April 2015. Dkt. No. 23 at

¶13. She missed her first payment on May 22, 2015. Id. at ¶16. The statute provided she was not in default until ten days after she had amount outstanding that *exceeded* one full payment. She had one full payment outstanding from May 22, 2015 through June 22, 2015; once the June 2015 payment became due, she had an amount outstanding that exceeded one full payment. She had that amount outstanding for ten days as of July 2, 2015. The date on GLS's notice of right to cure, however, is June 26, 2015. Dkt. No. 13-1.

The Wisconsin Court of Appeals has held that a creditor had no right to repossess the car when the creditor prematurely sent the notice of default. Indianhead Motors v. Brooks, 297 Wis. 2d 821, 827 (Ct. App. 2006). Finding the statute "clear and unambiguous," the Court of Appeals ruled that where payments are scheduled less than two months apart, a consumer is in default when an amount greater than one full payment remains unpaid for over ten days. Id. at 825. Because the plaintiff in Brooks missed her first payment on September 10, the amount became greater than one full payment on October 10. Id. Accordingly, she was in default when the larger balance remained unpaid for more than a ten-day period (beginning on October 10). Id. The court of appeals concluded that a creditor failed to give notice pursuant to Wis. Stat. §425.104 where it did not meet the timing requirements of Wis. Stat. §525.104(1) because it had sent the notice of right to cure the default prior to the expiration of the ten-day period. Id.

Under the reasoning of <u>Indianhead</u>, the plaintiff in this case has stated a claim that she was not in default when GLS sent the June 26, 2015 notice of right to cure. <u>See also</u> <u>Credit Acceptance Corp. v. Kong</u>, 344 Wis. 2d 259, 265 (Ct. App. 2012) (holding that notice was invalid when sent after two missed payments but before the ten-day period expired).

GLS argues that the June 26, 2015 notice isn't really relevant, however, because it took possession of the vehicle under the August 6, 2015 notice, by which time the plaintiff was in default. Dkt. No. 40 at 10. The plaintiff responds that the August 6, 2015 notice was invalid, because it violated Wis. Stat. §425.104. That statute requires that any merchant who believes a customer is in default provide must written notice of the alleged default with the following information:

> Any notice given under this section shall contain the name, address and telephone number of the creditor, a brief identification of the consumer credit transaction, a statement of the nature of the alleged default and a clear statement of the total payment, including an *itemization of any delinquency charges* or other performance necessary to cure the alleged default, the exact date by which the amount must be paid or performance tendered and the name, address and telephone number of the person to whom any payment must be made, if other than the creditor.

Wis. Stat. §425.104(2) (emphasis added).

The plaintiff argues that the August 6, 2015 notice did not separately itemize the delinquency charges. On the line next to "Delinquency Charges:," someone handwrote, "late charges." In the field for the amount, someone wrote, "30.00." Dkt. No. 13-2. GLS responds the statute does not state that a notice must separately list each delinquency charge; it simply requires the creditor to

itemize delinquency charges, plural. Dkt. No. 40 at 2. According to GLS, the legislature's failure to require "itemization of *each* delinquency charge" means that it did not intend to require an individual itemization for each charge.

The court does not find the statute's language as "plain" as GLS does. The fact that the legislature used the word "itemization" suggests that it expected something more than a lump sum amount. The Oxford Dictionary defines "itemize" as presenting a list of individual items or the process of breaking down a whole into its constituent parts. https://en.oxforddictionaries.com/definition/itemize. On the other hand, perhaps the legislature used the word "itemize" because it meant the creditor to list delinquency charges separately from late fees or other kinds of charges. The point is that there is an issue to be decided here.

GLS also argues that the form notice provided by the Wisconsin Department of Financial Institutions (DFI) supports its interpretation, because it provides only one line for delinquency charges. Dkt. No. 40 at 5. The form, which appears on the DFI website at https://www.wdfi.org/wca/forms.htm, and which GLS attached to its motion, dkt. no. 26-3, states as follows:

> You may cure the default on or before {*insert date that is 15 calendar days from the date of mailing*} by:
>
> ☐ Paying:  Late Payment {*insert due date*} $_____
>            Late Payment {*insert due date*} $_____
>            Late Payment {*insert due date*} $_____
>            Delinquency Charge           $_____
>                                         $_____
>                      Total              $_____

Dkt. No. 26-3.

The court again disagrees that the DFI form is dispositive.[1] The form seems to assume that there will be only one delinquency charge, and ignores the reality that in many cases, by the time the borrower is in default, more than one delinquency charge has accrued. Perhaps the drafters of the form interpreted the statute the way GLS urges this court to do, and assumed that the legislature wanted the creditor to list the sum of all delinquency charges. But the fact that the form drafters made that assumption (and we don't know that they did) does not mean that that is what the legislature meant. Again, the complaint raises an issue for decision.

GLS also argues that the only thing that really matters is that the August 6, 2015 notice "fulfilled the purpose of Wis. Stat. § 425.104(2), which is for the customer to have 'knowledge' of her default." Dkt. No. 40 at 5. In fact, neither notice provided the plaintiff with clear information about how much she owed in delinquency charges. The car purchase contract provided for a $10 fee for

---

[1] GLS argues that because it "acted in conformity" with the DFI form, "Wis. Stat. §426.104(4) provides the creditor with a safe harbor from any penalties." Dkt. No. 26 at 2. First of all, GLS neglects to mention that it used a form similar to, but not identical to, the DFI's sample form. Compare Dkt. Nos. 26-2, 26-3—the GLS form has only two lines for late payments, has a field for "Delinquency Charges," plural; has a category entitled "Other Charges," and lists "AMOUNT NOW DUE," rather than "Total." Second, §426.104(4) "creates a safe harbor for people who act in ways approved by the Administrator of the Department of Financial Institutions . . . ." https://docs.legis.wisconsin.gov/statutes/statutes/426/I/104. The fact that a creditor uses the DFI form does not mean that the DFI administrator approved the way the creditor used it, nor does it trump the creditor's obligation to comply with the statute.

each late payment.[2] Dkt. 26-1 at 1. The June 26, 2015 notice lists two late payments (May 22, 2015 and June 22, 2015), but lists delinquency charges of only $10.00. Dkt. No. 13-1 at 1. The August 6, 2015 notice lists two late payments (June 22, 2015 and July 22, 2015), but lists delinquency charges of $30.00. Dkt. No. 13-2 at 1. It appears that one notice informed the plaintiff that she owed a month's worth of late fees for two late payments, and the other told her that she owed three months' worth of late fees for two late payments, one of which had been listed on the *first* notice. So there is a question as to whether the August 6, 2015 notice did, as GLS argues, give the plaintiff "knowledge" of her default.

There are questions, then, about whether the August 6, 2015 notice was valid. If it was not, GLS was not legally entitled to repossess the car. If it was not entitled to repossess the car, the plaintiff's claims have legs

When the court views all of this in the light of the Rule 12(b)(6) standard, the court does not find that the plaintiff has failed to state the second, fourth and fifth claims. Will the claims survive summary judgment? If so, will the plaintiff prevail on the claims before a jury? The answers to those questions are irrelevant at the Rule 12(b)(6) stage. All that is relevant is that the plaintiff has stated cognizable claims.

---

[2] The Truth in Lending Disclosures box on p.1 of the Motor Vehicle Sale and Security Agreement states "Late Charge. If a payment is not paid on or before the 10th day after its due date, I will be charged $10.00 or 5% of the unpaid amount, whichever is less." Dkt. No. 26-1 at 1.

2.  *Whether the fact that GLS had a valid security interest gave it an independent right to repossess the plaintiff's car.*

Next, GLS argues that it had a valid security interest in the car, so it doesn't matter whether the notice of right to cure was ineffective; it had an independent legal right to repossess. Dkt. No. 25 at 2. Specifically, GLS argues that the plaintiff has no claim for civil theft if GLS had a valid security interest in the car, and that even if the notice of right to cure was invalid, that did not deprive GLS of its security interest, which defeats the plaintiff's illegal debt collection and conversion claims. Dkt. No. 26 at 13.

GLS does not state any case law in support of this argument. Rather, it looks at the elements of the civil theft, conversion and illegal debt collection causes of action. To state a claim for civil theft under Wis. Stat. §895.446, the plaintiff must show that the defendant (1) "intentionally used, transferred or retained possession of movable property of another," (2) without the owner's consent to taking and carrying away the property, (3) knowing that the owner did not consent, and (4) intending to deprive the owner permanently of the property. Estate of Miller v. Storey, 378 Wis. 2d 358, 378 (2017). GLS argues that because it had a valid security interest in the car, it had a lawful right to take and carry away the car. Dkt. No. 26 at 14. This argument assumes away Wisconsin's laws on repossession. GLS points to no case that says that if a creditor has a valid security interest, it can repossess without complying with Wisconsin's laws governing the repossession process.

GLS makes a similar argument with regard to the plaintiff's conversion claim. To state a claim for conversion, the plaintiff must show that the

defendant (1) exercised intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property. <u>Storey</u>, 378 Wis. 2d at 379. GLS argues that because it had a security interest, it could not have taken the car "without lawful authority." Dkt. No. 26 at 14. This argument ignores the fact that the security interest alone doesn't make the repossession lawful; GLS still had to comply with the laws governing the process of repossession.

With regard to illegal debt collection, Wis. Stat. §§427.104(1)(h) and (j) provide that a debt collector may not:

> (h)    Engage in other conduct which can reasonably be expected to threaten or harass the customer or a person related to the customer;

> (j)    Claim, or attempt to threaten to enforce a right with knowledge or reason to know that the right does not exist.

Wis. Stat. §427.104(h),(j). GLS says that because it had a valid security interest in the car, its repossession of the car was not an attempt to "enforce a right with knowledge or reason to know that the right does not exist." Dkt. No. 26 at 14. It argues that the repossession was its effort to enforce a right that *did* exist, due to the valid security interest. This argument ignores the plaintiff's allegations that GLS engaged in conduct that was threatening or harassing.

The fact that GLS had a valid security interest in the car does not come close to providing a basis for granting its motion to dismiss for failure to state a claim.

3. *Whether the fact that Wis. Stat. §425.302 provides a remedy for invalid notices of right to cure means that the plaintiff has not stated a claim for illegal debt collection*

Next, GLS makes the rather mystifying argument that the court must dismiss the plaintiff's third claim—the illegal debt collection claim—because, even if the August 6, 2015 notice of intent was invalid, "the exclusive remedy for a violation of Wis. Stat. § 425.105 is set forth in Wis. Stat. § 425.302," and that remedy is actual damages and a $25 penalty. Dkt. No. 26 at 15. GLS says that the plaintiff can't use the "general debt collection statute"—§427.104—to collect for what is really a violation of a specific statute, §425.105 (the first subsection of which requires the creditor to wait fifteen days after the notice of right to cure to repossess). Id. GLS appears to argue that the plaintiff cannot make a general claim that GLS violated the Wisconsin repossession scheme, but instead must pursue one claim for an invalid notice, and another for failure to wait fifteen days after the notice, etc. It argues that by pursuing a general repossession claim, the plaintiff is trying to recover twice.

This argument, frankly, baffles the court. The illegal debt collection claim is not based solely on the plaintiff's allegation that the August 6, 2015 notice was defective. Regardless of whether the August 6, 2015 notice was defective, the plaintiff alleges that GLS engaged in conducted expected to threaten or harass her by (1) making her "pay" to make a payment, (2) repossessing her car even though the plaintiff's money was sitting in GLS's back account, (3) failing to honor the agreed upon payment plan, (4) telling her that repossession was put on hold and then towing the car after she made the payment, (5) changing

28

the amounts due, and (6) calling her son and sister looking for the car. GLS's argument—that because *one* of the reasons the plaintiff alleges GLS's debt collection was illegal was the allegedly invalid notice, she cannot pursue an illegal debt collection claim for all the other conduct—makes no sense.

4. *Whether the plaintiff has failed to state, as a matter of law, that GLS engaged in threatening or harassing conduct*

GLS also argues that the plaintiff cannot prove, as a matter of law, that GLS engaged in threatening or harassing conduct, and so the court must dismiss the illegal debt collection claim. Dkt. No. 26 at 17. GLS says that Wis. Stat. §427.104(1)(g)—which immediately proceeds the illegal debt collection statute—prohibits a creditor from communicating with customers, or their relatives, with such frequency, or at such hours, that the communications could be expected to threaten or harass the customer. Id. GLS says the plaintiff hasn't sued under that statute. Rather, she's sued under the next provision, which prohibits the creditor from engaging in "other" threatening or harassing conduct. Id. GLS reasons that it can't be liable under Wis. Stat. §427.104(1)(h) unless the plaintiff alleges that it did something other than communicate with the plaintiff or her family in a threatening or harassing way, and that she has not alleged that.

In fact, the plaintiff *has* alleged more than just threatening or harassing communications. She's alleged that she was forced to make a payment, that GLS agreed not to repossess her car and then did it anyway, and that it changed the amounts it claimed she had to pay to avoid repossession. The

plaintiff has, at this stage, stated a claim for a violation of Wis. Stat. §427.104(1)(h).

> 5.   *Whether the plaintiff has failed to state, as a matter of law, that GLS took more money from her than required for her to get her car back*

Finally, GLS claims that the court must dismiss the plaintiff's conversion claim, because it did not take more money from her than she was required to pay to get the car back. Dkt. No. 26 at 18. In support of this argument, GLS walks through various Wisconsin statutes that permit creditors to include certain costs in redemption fees, does its own math, and argues that by its calculations, it required the plaintiff to pay less than what it could have required in redemption fees. Id. at 18-19. This argument is nothing more than GLS telegraphing its defense to the conversion claim. To prevail on a motion to dismiss, a defendant must show that the plaintiff has not stated a claim that is plausible on its face, not that the defendant believes it eventually will be able to defend against a plausible claim. That GLS believes it can ultimately show that it did not collect more than it was entitled to has no relevance to whether the plaintiff has stated a plausible conversion claim—she has.

## V.   Conclusion

The court **DENIES** the joint motion for extension of time to file answer by defendants All City Recovery, Inc. and Always Towing and Recovery, Inc. Dkt. No. 56.

The court **DENIES** defendants All City Recovery, Inc. and Always Towing and Recovery, Inc.'s motion for summary judgment. Dkt. No. 45.

The court **DENIES** defendant Global Lending Services LLC's motion to dismiss. Dkt. No. 25.

The court's staff will send out a separate notice for a Rule 16 scheduling conference.

Dated in Milwaukee, Wisconsin this 5th day of September, 2018.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**